UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

BURTON W. WIAND, as Receiver for
VALHALLA INVESTMENT PARTNERS,
L.P.; VIKING FUND, LLC; VIKING IRA
FUND, LLC; VICTORY FUND, LTD.;
VICTORY IRA FUND, LTD., AND
SCOOP REAL ESTATE, L.P.,

        Plaintiff,

v.                                       Case No. 8:10-cv-92-T-17MAP

DANCING $, LLC,

        Defendant.

_____/

## REPORT AND RECOMMENDATION

      This is one of many cases in this division emanating from a Securities Exchange Commission enforcement action aimed at dealing with the aftermath of a massive ponzi scheme perpetrated by Arthur Nadel, a hedge fund manager. *See SEC v. Arthur Nadel, et al.,* Case No. 8:09-cv-87-T-26TBM. After the SEC's action and the appointment of Burton Wiand as the Receiver, Nadel pled guilty in the Southern District of New York to a fifteen count indictment charging him with securities fraud, mail fraud, and wire fraud surrounding the events precipitating the enforcement action. The Receiver has sued numerous hedge fund investors, including Dancing $ LLC ("Dancing $"), seeking to claw back "false profits" under two theories grounded on the same illegal scheme the indictment tracks: avoidance of fraudulent transfers under Florida's Uniform Fraudulent Transfer Act, Fla. Stat. §§ 726.101,*et seq.* ("FUFTA"), and unjust enrichment.[1] Currently, the Receiver

_____

[1] These types of cases are often called "clawback" actions.

moves for summary judgment on a precise but critical issue to the determination of this action –

Nadel operated the hedge funds as a ponzi scheme during the distributions of "false profits" to

Dancing $ (*see* docs. 72, 97).  After considering Dancing $'s responses (docs. 95, 114) and the

summary judgment record, I find that no material dispute of facts exists and recommend the

Receiver's motion for summary judgment be granted.[2]

### A.  Standard of review

Motions for summary judgment should only be granted when the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, show there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of

law.  Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,*  477 U.S. 317, 322 (1986).  A court, however,

may only consider "that evidence which can be reduced to an admissible form," *Rowell v. BellSouth*

*Corp.,* 433 F.3d 794, 799 (11th Cir. 2005).  The existence of some factual disputes between the

litigants will not defeat an otherwise properly supported summary judgment motion; "the

---

[2]  The procedural posture of the Receiver's summary judgment motions warrants an explanation.  This Court convened early Rule 16 conferences in almost all of the more than 150 clawback cases and often grouped several cases at a time for such conferences in order to facilitate conversations and cooperation among counsel.  To a degree, that effort proved efficient as many cases settled and many defendants shared common resources.  Based on discussions with the parties at those conferences, the Court agreed to stagger the summary judgments. Initially, the Receiver would file a motion for partial summary judgment on the liability issue, as the Receiver did here (*see* doc. 72).  That motion sought a finding as a matter of law that Nadel operated a Ponzi scheme from the inception.  Dependent on the ruling, the Receiver would file another summary judgment motion on damages (*i.e.,* the demand for false profits).  Given the number of cases pending, this bifurcated process, in hindsight, turned out to be too unwieldy. With case-management deadlines pressing, the Receiver filed another motion for summary judgment (doc. 97).  Unlike the first, this one sought a summary judgment ruling on liability and damages.  The upshot of all this is that the two motions merge for decisional purposes, and the Court has considered Dancing $'s responses to the motions.  As with all the dispositive motions in this case and the other clawback cases, the district judge has referred them to me for reports and recommendations.

requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)(emphasis in original). The substantive law applicable to the claimed causes of action will identify which facts are material. *Id.* In considering the evidence, the court resolves all reasonable doubts about the facts in favor of the non-moving party and draws all justifiable inferences in its favor. *Hickson Corp. v. Northern Crossarm Co., Inc.*, 357 F.3d 1256, 1260 (11th Cir. 2004). The court does not, however, weigh the evidence or make findings of fact. *Anderson*, 477 U.S. at 249-50.

### B. Background

This case is one of numerous clawback actions the Receiver has filed in this division. With a few exceptions, all the complaints are alike in their recitals about Nadel, his conduct, and the Receiver's causes of action against a defendant. Any differences are due to the peculiarities of the defendant and the dates and the amounts of the specific distributions made to a defendant. Here, for example, the Receiver alleges Dancing $, a Montana LLC comprised of 136 members, received distributions from January 2008 through April 2008 totaling $107,172.11 in false profits (doc. 1, ex. A; doc. 115 (Waldman Decl. ¶ 2)). In a number of cases, including this one, the Receiver has moved for summary judgment on a discreet factual determination that goes to the heart of his FUFTA claims – that Nadel operated the hedge funds as a ponzi scheme from their inception. Frankly, the Receiver frames the factual issue more broadly than required. Instead, the case-specific questions should be: Did Nadel operate the hedge funds as ponzi scheme when he made the distributions to Dancing $, and if so, is the evidence so one-sided that the Receiver is entitled to summary judgment on this issue as a matter of law? Before answering those questions, however, it is helpful to understand the events leading up to the Receiver's current partial summary judgment motion and FUFTA's application to

a clawback case like this one.

### 1.  the events leading up to the current motion

Because these clawback cases presented overlapping legal arguments and a core of common, relevant facts, the Receiver initially filed an omnibus motion for partial summary judgment directed to a number cases, including Dancing $ (*see* doc. 30, ex. A).[3]  In that motion, the Receiver argued for the same factual determination he seeks in his current motion before the Court (*i.e.* Nadel operated the hedge funds as a ponzi scheme from the earliest hedge fund's inception (1999)).  But the prior motion differs significantly from the latter one as both sides have added to the summary judgment record and a new development occurred – Nadel's death. *See* Supplement to Receiver's Renewed Motion for Partial Summary Judgment, doc. 75.

### a.  the Receiver's first partial summary judgment attempt

In the first motion, the Receiver proffered certain items: Nadel's indictment, Nadel's plea transcript and plea agreement letter, the government's sentencing memorandum, the criminal judgment, and some of Nadel's letters and personal memos.  Armed with this record, the Receiver argued that the clawback defendants, including Dancing $, should be "precluded from litigating facts necessarily established" by Nadel's guilty plea in the Souther District of New York (*see* doc. 30 at 10).  Such a finding would have created the irrefutable presumption of an actual intent to defraud creditors beginning in 1999, the start date of the ponzi scheme.  I interpreted the Receiver's argument to be a form of offensive collateral estoppel or some stand-alone doctrine of preclusion (*e.g.*, doc. 30, at 10 n.3).  Many defendants, including Dancing $, objected to this novel theory along two themes: offensive collateral estoppel did not apply to them and they needed to conduct

---

[3]  The district judge referred these motions to me for reports and recommendations.

additional discovery.  After considering the Receiver's omnibus motion and the numerous responses made by the clawback defendants, I concluded offensive collateral estoppel did not apply.  *See* doc. 64, Omnibus Order dated February 3, 2012.[4]   Nonetheless, I deferred any consideration of the motion's remaining aspects for a number of reasons so that the defendants could conduct further discovery and the Receiver could supplement the summary judgment record and address my evidentiary concerns about the then state of the record.[5]  *Id.*  Despite the fact that I deferred issuing a report and recommendation on the Receiver's initial partial summary judgment, the February 3 Order has distinct, contextual relevance to the current summary judgment record.

### b.  the February 3 Order

Aside from putting off the consideration of the summary judgment issues until further discovery could occur, the February 3 Order forewarned the parties, and particularly the clawback defendants (including Dancing $), about two interrelated points I considered important to the determination of any future summary judgment motion.  The first reminded the clawback defendants

---

[4]   The Receiver continues to make his "preclusive effect" arguments even after my February 3 Order.  I summarize the reasons why I rejected that argument in that Order here.  Offensive collateral estoppel occurs when a plaintiff seeks to foreclose the defendant from litigating an issue the defendant previously litigated unsuccessfully in an action with another party.  *Parklane Hosiery Co., Inc. v. Shore,* 439 U.S. 322, 326-27 (1979).  Nadel was not a party to any of the clawback actions, and the defendants obviously were not defendants in Nadel's criminal action; accordingly, precluding the clawback defendants from being heard on the factual matters raised in their respective cases violated due process.  *Id.* at 327 n.7.  For these reasons and those outlined in the February 3 Order, the Receiver's arguments on this score are not well taken.

[5]   I also determined that Nadel's letters and memos were clearly inadmissible hearsay under Fed. R. Evid. 804(b)(3) because the Receiver had not shown Nadel to be unavailable as a witness under Fed. R. Evid. 804(a).  Because a court evaluating a summary judgment motion may only consider that evidence which can be reduced to an admissible form, these items were unacceptable for summary judgment purposes.  *See Rowell,* 433 F.3d at 800.

about their obligations when responding to a summary judgment motion:

> [I]f the moving the moving party makes the required showing, the burden shifts to the non-moving party to rebut that showing by producing counter-evidence in admissible form, *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986); and the existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion unless the dispute presents a "*genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986) (emphasis in original).[6]

The second point underscored the evidentiary significance of Nadel's criminal proceedings for summary judgment purposes.  In short, while Nadel's judgment did not carry any preclusive effect (as the Receiver argued), the clawback defendants could not ignore the summary-judgment heft of the criminal proceedings and the significant evidentiary hurdle those proceedings posed to them.  My admonitions about this were specific (doc. 64 at 7-9)[7]:

> Nadel's plea transcript, however, is appropriate for summary judgment consideration either under Fed. R. Evid. 807 or as a declaration or deposition for purposes of Rule 56(c).  In short, the plea transcript carries a heightened standard of reliability and trustworthiness.  *See In re Slatkin*, 525 F.3d 805, 812 (9th Cir. 2008) (applying Rule 807's residual hearsay exception due to proceeding's reliability); *Scholes v. Lehmann*, 56 F.3d 750, 762 (7th Cir. 1995) (a defendant's admissions in a guilty plea proceeding and in a plea agreement that is part of the guilty plea carry "veracity safeguards" exceeding a deposition).  The same would be true for Nadel's sentencing hearing transcript, although Wiand does not include it with his motion.

> Particularly significant is Fed. R. Evid. 803(22)(C)'s application, which Wiand does not address.  That rule, which applies irrespective of the declarant's availability, states that evidence of a final judgment of conviction based on a guilty plea is admissible if the evidence is admitted to prove "any fact essential to the judgment."  *See Scholes v. Lehmann,* 56 F.3d at 762 (applying rule  in clawback

---

[6]  *See* Doc. 64 at 4.

[7]  For the ease of the reader, the footnotes appearing in the February Order are not copied in the body of the quoted text but as a newly numbered footnote which identifies the copied footnote in the Order.

action at summary judgment stage).[8]  Of particular evidentiary significance, which none of the parties mention, is the judgment's order directing Nadel to pay $174,930,211.07 in restitution.  This figure, which corresponded to the loss calculation for guideline sentencing purposes, covers losses the fraud victims incurred from 1999 to 2009.[9]  So too is the amount Nadel forfeited to the government ($162 million).[10]  Both amounts are dependent on facts essential to their calculations.

The statutory sentencing scheme enforces the adjudicatory effect to be given to the restitution order.  For example, 18 U.S.C. § 3664(*l*) provides:

---

[8]  As the Order noted (doc. 64 at n.10):
Per Rule 802(22)'s advisory committee note, "[w]hen the status of a former judgment is under consideration in subsequent litigation, three possibilities must be noted: (1) the former judgment is conclusive under the doctrine of res judicata, either as a bar or a collateral estoppel; or (2) it is admissible in evidence for what it is worth; or (3) it may be of no effect at all … The rule does not deal with substantive effect of the judgment as a bar or collateral estoppel.  When, however, the doctrine of res judicata does not apply to make the judgment either a bar or a collateral estoppel, a choice is presented between the second and third alternatives.  The rule adopts the second for judgments of criminal conviction of felony grade."

[9]  As the Order noted (doc. 64 at n. 11):
From the government's sentencing memorandum (by its silence on the issue), it appears that Nadel did not contest the probation officer's loss calculations as set out in the presentence report.  Fed. R. Crim. P. 32(c)-(f).  The presentence report and any addendum to it serve the same purpose as a pretrial stipulation in a civil bench trial, with the report setting out the factual and legal backdrop for the upcoming sentencing hearing and the addendum listing the disputed factual and legal issues that the court must decide.  *United States v. Wise,* 891 F.2d 970, 972 (11th Cir. 1989).  Nadel's failure to object acknowledged the accuracy of the probation officer's loss calculation.  Of course the sentencing transcript would clearly speak to this issue as would the forensic accounting proof supporting the loss calculations.

[10]  As the Order noted (doc. 64 at n. 12):
Of particular note in criminal forfeitures like Nadel's is the relation-back doctrine, which operates retroactively to vest title in the government effective as of the time of the act giving rise to the forfeiture.  *United States v. Bailey*, 419 F.3d 1208, 1213 (11th Cir. 2005).  *See also United States v. 92 Buena Vista Ave.,* 507 U.S. 111, 125 (1993).  Wiand does not include the forfeiture order issued by the court in the Southern District of New York.

> A conviction of a defendant for an offense involving the act giving rise to an order of restitution shall estop the defendant from denying the essential allegations of that offense in any subsequent Federal or State civil proceeding, to the extent consistent with State law, brought by the victim.[11]

And per 18 U.S.C. § 3664(m)(1)(B), at the request of a victim named in the restitution order, the clerk is required to issue an abstract of judgment certifying the judgment in the victim's favor as noted therein and thereby allowing the victim to enforce the judgment as lien on property of the defendant.  The upshot of Rule 803(22) is that the Defendants are not looking at a blank summary judgment slate.

The Order's conclusion again reminded the defendants about their burden-shifting obligations under the summary judgment scheme:  "Nadel's criminal conviction, and the facts it necessarily embraces, not to mention the accessible proof available from that prosecution, are convincing evidentiary hurdles Wiand puts out for the Defendants to meet."  *See*  doc. 64 at 9-10.

### c.  new evidentiary material and Nadel's death

The Receiver's summary judgment papers move for the same factual finding as the original motion for partial summary judgment but add new evidentiary material including: the criminal judgment against Nadel on counts one through and fifteen in the indictment, the restitution order included within that judgment in the amount of $174,930,311.07, the sentencing transcript, the forfeiture order, and the declaration of  forensic accountant (Maria Yip).  *See* docs. 73-17; 73-18;

---

[11]  As the Order noted (doc. 64 at n. 13):
Although I find no cases interpreting the scope of 18 U.S.C. § 3664(*l*), the provision simply implements issue preclusion or collateral estoppel principles.  By its strict wording, it plainly would not to these clawback actions as they are not technically suits initiated by a "victim," despite Wiand's equitable, fiduciary obligations to the victims.  However, the practical effect of Nadel's conviction is that he will not be able to deny essential facts that judgment necessarily incorporates.  *Scholes v. Lehmann*, 56 F.3d at 762 (when considering summary judgment motion, a witness should not be permitted by a subsequent affidavit to retract admissions made in plea agreement).

73-19; 74 (Yip Decl., March 23, 2012); 77 (Yip Supp Decl., May 11, 2012); 92-1 (Revision to Yip

Decl., July 19, 2012); 98 (Yip Decl., Sept. 27, 2012); 104 (Yip Decl., Oct. 11, 2012).  Moreover, in

light of Nadel's death on April 16, 2012, the previous complaints about Nadel's personal letters and

memos dissipated.  Receiver now satisfied the unavailability demands of Fed. R. Evid. 804(a), and

Nadel's statements against interest are appropriate evidentiary considerations for summary judgment

purposes.

### 2.  FUFTA

A vast majority of states have adopted the Uniform Fraudulent Transfer Act (UFTA), an act

"designed to prevent debtors from transferring their property in bad faith before creditors can reach

it."  *BMG Music v. Martinez,* 74 F.3d 87, 89 (5th Cir. 1996).  Federal district and bankruptcy courts

adopt a largely uniform practice allowing receivers to bring suits under UFTA against ponzi scheme

investors to the extent that investors have received payments in excess of the amounts invested and

those payments are avoidable as fraudulent transfers.  *Donell v. Kowell,* 533 F.3d 762, 770 (9th Cir.

2008) ("the policy justification is ratable distribution of remaining assets among all defrauded

investors").  Hence, the innocent "winners" in a ponzi scheme should not be permitted to "enjoy an

advantage over later investors sucked into the ponzi scheme who were not so lucky."  *Id.* citing *In

re United Energy Corp.,* 944 F.2d 589, 596 (9th Cir. 1991).

Under Florida's version ("FUFTA") (*see* Fla. Stat. § 726.101, *et seq.*), like other UFTA

schemes, a receiver may proceed under two theories, actual fraud or constructive fraud.  *See e.g.

Wiand v. Waxenberg,* 611 F.Supp. 2d 1299, 1318-19 (M.D. Fla. 2009); *In re World Vision

Entertainment, Inc.*, 275 B.R. 641 (M.D. Fla. 2002).  And in count I, the Receiver proceeds under

both of these theories.  Under Fla. Stat. §726.105(1)(a), codifying actual fraud, the Receiver claims

9

the transfers of false profits were fraudulent because Nadel (the debtor) caused the hedge funds to make the transfers to Dancing $ as part of a scheme with actual intent to hinder, delay, or defraud creditors of Nadel, the fund managers and/or the hedge funds.[12]   As such, the Receiver alleges a right to repayment of the investors' commingled principal investment money in an amount equivalent to Dancing $'s false profits from one or more of the hedge funds.  The Receiver also proceeds under Fla. Stat. §§ 726.105(1)(b) and 726.106(1), for constructive fraud.[13]   *See* doc. 1, ¶¶ 105-113.

Where a debtor engages in a ponzi scheme, proof of a ponzi scheme satisfies UFTA's "actual

---

[12]   The Receiver alleges that in light of the right to repayment, the hedge funds have a claim against Nadel and consequently are creditors of Nadel under FUFTA; thus, Nadel is a debtor under FUFTA.   For this case, the Receiver contends that the transfers of false profits to Dancing $ were inherently fraudulent because they were made as part of Nadel's scheme.  As representative of the receivership entities (the hedge funds), the Receiver asserts he is entitled to avoid and recover transfers equal to the amount of false profits that Nadel caused the hedge funds to make to Dancing $, and any other pertinent remedy available under Fla. Stat. §726.108, because the money was commingled among hedge funds and Nadel used the hedge funds as a single, continuous scheme.  *See* doc. 1, ¶¶ 110-113

[13]   A transfer is fraudulent under a theory of constructive fraud if the transferor does not receive reasonable value in exchange and the transferor either (1) was engaged or was about to engage in a business or a transaction for which the remaining assets of the transferor were unreasonably small in relation to the business or transaction; (2) intended to, believed, or reasonably should have believed that he or she would incur debts beyond his or her ability to pay them as they became due; or (3) was insolvent at the time of the transfer.  *See* Fla. Stat. §§ 726.105(1)(b)(1)-(2) and 726.106(1).  The Receiver asserts that the transfers were also fraudulent under Fla. Stat. § 726.105(1)(b) because Nadel caused the hedge funds to make those transfers and Nadel, the fund managers, and the hedge funds were engaged or were about to engage in a business or transaction for which their remaining assets were unreasonably small in relation to the business or transaction, or Nadel intended that he, the fund managers, and/or the hedge funds incur, or believed or reasonably should have believed they would incur, debts beyond their ability to pay as they became due. Finally, the Receiver asserts that the transfers were fraudulent under Fla. Stat. § 726.106(1) because neither Nadel, the fund managers, nor the hedge funds received a reasonably equivalent value in exchange for those transfers to Dancing $, and Nadel, the fund managers, and the hedge funds were insolvent at all relevant times.  *See* doc. 1, ¶¶ 110-111.

intent to hinder, delay, or defraud creditors" requirement. *See Donell, supra,* 533 F.3d at 770-71 citing *Scholes v. Lehmann,* 56 F.3d 750 (7th Cir. 1995) (general rule is that to extent innocent investors received payments in excess of amounts of principal originally invested, payments are avoidable as fraudulent transfers); *Wiand v. Waxenberg,* 611 F.Supp.2d 1299, 1312 (M.D. Fla. 2009) citing *In re McCarn's Allstate Fin. Inc.,* 326 B.R. 843, 850 (M.D. Fla. 2005) (existence of a ponzi scheme suffices as a matter of law to prove actual intent to defraud for purposes of Fla. Stat. §725.105(1)(a)).   To prove a ponzi scheme, the Receiver must establish: (1) deposits made by investors; (2) the Receivership Entities conducted little or no legitimate business operations as represented to investors; (3) the purported business operations of the Receivership Entities produced little or no profits or earnings; and (4) the source of payments to investors was from cash infused by new investors. *Waxenberg, supra,* at 1312.   Here, the Receiver's motion for summary judgment adopts this ponzi-scheme method to establish that the monies transferred to Dancing $ were fraudulent transfers in violation of §726.105(1)(a).

Although the Receiver points to the start date of Nadel's scheme as the critical date, the relevant period is the time of the transfers. *In re Old Naples Sec., Inc.,* 343 B.R. 310, 319 (M.D. Fla. 2006) (examining intent at time transfers made when interpreting Fla. Stat. §726.105(1)(a)); *Veigle v. U.S.,* 873 F.Supp. 623 (M.D. Fla. 1994) (determining transferor's intent to defraud at time transfer made for purposes of Fla. Stat. 726.105(1)(a)); *Bay View Estates Corp. v. Southerland,* 154 So. 894 (Fla. 1934) (fraud rests upon debtor's intent at time of the transfer).   Hence, whether Nadel operated the hedge funds as ponzi scheme as early as 1999, as the Receiver proposes, is an unnecessarily broad question to examine.   *See* doc. 1, ex. A.  For Dancing $, the relevant time is from January 2008 through April 2008, the beginning and ending dates of its distributions. Accordingly, if the

Receiver's ponzi-scheme evidence for this period is one-sided (i.e., the evidence of actual intent to hinder, delay, or defraud creditors is so one-sided), the Receiver is entitled to summary judgment on the issue. *Anderson,* 477 U.S. at 255 (when confronted with a summary judgment motion a court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law"); *Hickson Corp. v. Northern Crossarm Co., Inc.*, 357 F.3d 1256, 1260 (11th Cir. 2004) (same).

C. *Discussion*

With the above principles in mind, the summary judgment record overwhelmingly points to the fact that Nadel operated the hedge funds as a ponzi scheme by the time Dancing $ received its first distribution in January 2008. In sum, the Receiver's forensic accountant confirms what Nadel admitted in his criminal proceedings and that court adjudicated. Even when the summary judgment record is viewed in Dancing $'s favor, Dancing $ offers little to overcome the Receiver's properly supported motion.

1. *an overview of the scheme*

From 1999 through January 2009, Nadel, through Scoop Capital, LLC ("Scoop Capital") and Scoop Management, Inc. ("Scoop Management"), along with Christopher Moody and Neil Moody, through Valhalla Management, Inc. ("Valhalla Management") and Viking Management, LLC ("Viking Management") (Scoop Capital, Scoop Management, Valhalla Management, Viking Management are collectively the "fund managers") managed certain hedge funds including Valhalla Investment Partners, L.P. ("Valhalla Investment"), Viking Fund, LLC ("Viking Fund"), Victory IRA Fund, LLC ("Viking IRA Fund"), Victory Fund, Ltd. ("Victory Fund"), Victory IRA Fund, LTD ("Victory IRA Fund"), and Scoop Real Estate, LP ("Scoop Real Estate"). And throughout this

period, Nadel misrepresented the hedge funds' performance.  By defrauding investors through his control over the fund managers and the hedge funds, Nadel raised over $350 million dollars from hundreds of investors.  While a large majority of hedge fund investors received no distributions of purported profits, or received distributions in amounts less than their investments, a number of investors received hedge fund distributions that exceeded their investments.

In late 2008 or early 2009, the house of cards crashed.  The SEC filed an emergency action in this division on January 21, 2009, asking for a wide-ranging temporary injunction freezing Nadel's assets, requiring him to provide a sworn accounting, and prohibiting his travel outside the United States.  The district judge quickly granted the request.  *See Securities and Exchange Commission v. Arthur Nadel, et al.,* Case No. 8:09-cv-87-T-26TBM.  Coinciding with these events, a magistrate judge in the Southern District of New York issued a warrant for Nadel's arrest based on a complaint charging Nadel with securities fraud and wire fraud.  At some point during all this (and likely before the enforcement order), Nadel fled.[14]  Eventually, the complaint in the Southern District ripened into a fifteen-count indictment that charged Nadel with securities fraud (counts one through six), mail fraud (count seven), and wire fraud (count eight through fifteen).  Nadel pleaded guilty to all the counts, was sentenced to 168 months in confinement, and ordered to pay $174,930,311.07 in restitution (doc. 73).  He died in prison on April 16, 2012.

### 2. Yip's analysis

The Receiver submits the analysis of his forensic accountant, Maria M. Yip ("Yip"), to support his contention that Nadel operated the hedge funds as a ponzi scheme.  Yip analyzed records

---

[14]  All this is in the public record.  Nadel was arrested and appeared in this division for removal proceedings on the Southern District's warrant.  *See United States v. Arthur G. Nadel*, Case No. 8:09-MJ-1039-MAP (doc. 5).

13

from 29 bank accounts, 24 brokerage and trading accounts, the hedge funds and fund managers'
books and records, accounting records of the receivership entities, Advent Software investor
accounting system activity, member status reports, tax records for Traders Investment Club and the
receivership entities, and reports prepared by Riverside Financial Group analyzing account activity
for brokerage accounts ("the Nadel documents").[15]  Yip opines that from at least December 1999
through January 2009, Nadel through the fund managers managed the hedge funds and grossly
misrepresented their performance, and defrauded investors through his control of the hedge funds
(Yip Decl. ¶ 25).[16]  Yip further opines:

> Based on our review and analysis of the documents, Nadel in combination with
> Christopher Moody and Neil Moody raised at least $327 million from investors
> between May 1999 and January 2009.  The money was raised in connection with
> more than 700 investor accounts.  The money was raised as part of a single,
> continuous Ponzi scheme.  Investors received statements ("Investor
> Statements") on a monthly basis for each of their respective accounts.  These
> Investor Statements showed purported appreciation and increase in Investor
> Account balances that were in fact not true.  Providing these fictitious balances
> not only maintained the investors "in the dark" about the actual performance of
> these funds but just as important, it served as the basis for the Management Fees
> that the Fund Managers charged to each of the Investor Accounts.

Yip Decl. ¶¶ 47-50, March 23, 2012; Revision to Yip Decl. ¶8 (revising amount raised from $336

---

[15]  Affidavits such as Yip's have routinely been admitted to demonstrate that an enterprise
operated as a ponzi scheme and was consequently insolvent.  *Stenger v. World Harvest Church,
Inc.,* 2006 WL 870310, *11 (N.D. Ga. 2006) citing *In re Lake Country Invs.,* 255 B.R. 588, 595-
96 (Bankr. N.D. Idaho 2000) (expert affidavit sufficient); *In re Ramirez Rodriguez,* 209 at 431
(expert affidavit sufficient); *In re Colonial Realty Co.,* 209 B.R. 819, 821-22 (Bankr. D. Conn.
1997) (expert affidavit sufficient); *In re Taubman,* 160 B.R. 964, 976-80 (Bankr. S.D. Ohio
1993) (expert affidavit sufficient); *In re Int'l Loan Network, Inc.,* 160 B.R. 1, 7-10 (Bankr.
D.D.C. 1993) (expert affidavit and prior judicial decisions sufficient).

[16]  Yip relied upon a memo/letter of Nadel's dated on or about February 5, 2009, that he
provided false gains as early as 1998.  *See* Yip declaration, n.2 citing *U.S. v. Nadel,* U.S. District
Court for the Southern District of New York, case no. 1:09-cr-00433-JGK (doc. 71-6).

million to $327 million based on further review and analysis), July 19, 2012. Yip's review of the financial records and comparison of balance of principal invested by investors according to the K-1s issued by the hedge funds with the actual balance in the bank, brokerage and trading accounts during the years 1999 through 2008 revealed that Nadel significantly misrepresented the values in the investor accounts and the investor accounts had a fraction of the purported balances (Yip Decl. ¶59, March 23, 2012; Revision to Yip Decl. ¶9, July 19, 2012).  She finds, based on a comprehensive review of the books and records of the hedge funds, that the funds were insolvent as early as 2000 and through and including January 2009 (Yip Decl. ¶82, March 23, 2012; Revision to Yip Decl. ¶10, July 19, 2012).

Yip states that Nadel, in combination with Christopher Moody and Neil Moody, raised $327 million from investors in connection with more than 700 investor accounts between May 1999 and January 2009.  *See* Yip Decl. ¶¶ 47-48, March 23, 2012; Revisions to Yip Decl. ¶8, July 19, 2012. Her report indicates that investors received monthly statements for each of their respective accounts showing purported appreciation and increase in investor account balances that were in fact not true. Yip Decl. ¶ 50, March 23, 2012.  Nadel controlled a number of bank, brokerage, and trading accounts from July 1999 through January 2009, and he transferred money received from investors among a number of those accounts.  Investor funds were directly deposited into bank accounts maintained at SouthTrust (later acquired by Wachovia), Bank of America, and Northern Trust, and funds from these bank accounts were transferred to brokerage accounts for the purpose of investing the investors' funds.  Yip Decl. ¶¶ 51-53, March 23, 2012.  Funds from these brokerage accounts were transferred back to the Hedge Funds' respective bank accounts to pay management fees based on purported account balances, management fees based on purported profits, and redemptions to

15

investors. Nadel also transferred funds from these brokerage accounts to other accounts he controlled, including personal bank accounts at Wachovia Bank with names similar to Hedge Fund accounts. Yip Decl. ¶¶ 55-56, March 23, 2012. According to Yip, "Nadel created these accounts for two Hedge Funds on whose behalf he did not have authority to act ... [and he] had complete access and control of the funds deposited into these accounts." Yip Decl. ¶ 56, March 23, 2012.

Yip further declares that Nadel pooled funds received from investors and deposited into accounts, commingled these funds with other investors' money, and transferred the money from those accounts into other bank, brokerage, and trading accounts in which the money was further pooled and commingled with other investors' money. Yip opines that her review revealed that "Nadel pooled and commingled investors' monies regardless of with which Hedge Fund the monies had been invested; that Nadel not only commingled the monies in these accounts, he would also transfer funds into the brokerage accounts as necessary in order to have sufficient funds from which to pay redemptions; and that these funds would be transferred from the Hedge Fund brokerage account to the Hedge Fund bank account from which the investor would receive his or her redemption." Yip Decl. ¶ 58, March 23, 2012.

According to Yip, the balances of the principal invested by investors, as reflected by the K-1s issued by the Hedge Funds during the years 1999 through 2002, clearly showed that Nadel significantly misrepresented the values in the investor accounts, which had only a fraction of the purported balances. Yip Decl. ¶ 59, March 23, 2012; Revisions to Yip Decl. ¶9, July 19, 2012. *See* Table comparing balance of principal invested compared to actual account balances; Yip Decl. Ex. 59, March 23, 2012, containing balances purportedly in the accounts for the investors at each quarter end during the period of January 2003-December 2008. For example, according to Advent's investor

statements, at the end of the first quarter of 2003 investors had invested a total of $49,363,230 with Nadel and the hedge funds, when in actuality the total balances in the bank, brokerage and trading accounts were $19,987,238.  And, at the end of the fourth quarter of 2008, investors had invested a total of $294,512,345 with Nadel and the hedge funds when in actuality the total balances in the bank, brokerage and trading accounts were $1,338,471.  Yip Decl. ¶ 61, March 23, 2012.

Yip concludes that analysis showed that for each quarter between the first quarter of 2003 and the fourth quarter of 2008, the Hedge Funds always had significantly less money in the financial accounts than the amounts deposited by investors.  Yip Decl. ¶ 64, March 23, 2012.  Moreover, Nadel also controlled Traders Investment Club, another investment vehicle purportedly operated separately from the hedge funds.  Yip opines that, similar to the hedge funds, Nadel represented to investors that he had achieved high rates of return in order to induce investors to invest.  Yip Decl. ¶ 28, March 23, 2012. Yip reviewed Traders' brokerage statements, Traders' bank statements, yearly federal income tax returns, Partners' Capital Balances statements from Advent and Individual Account Statements, and concluded that Nadel utilized investor principal to pay new investors, and in fact, used investor monies from the hedge funds to pay for Traders' investors' redemptions.  Yip Decl. ¶¶ 65-72, March 23, 2012.  As early as 2003, Traders did not have the assets necessary to pay the amounts represented as owed to investors, and investor distributions were paid with new investor funds, often from the Hedge Funds.  Yip Decl. ¶ 74, March 23, 2012.

Nadel's records, according to Yip, show that Nadel lost more than $23 million over the period of September 1999 through December 2008.  Specifically, Scoop Real Estate LP lost $6,637,880; Valhalla Investment Partners lost $3,114,011; Victory Fund Ltd. And Victory Funds IRA Fund lost $4,209,134; and Viking Fund LLC and Viking IRA Fund, LLC lost $9,116,715.  Yip

Decl. ¶ 78, March 23, 2012.  Yip's review did not reveal any other sources of funding for Nadel's

hedge funds or fund managers other than a negligible amount from Scoop Real Estate representing

less than 1% of the funds.  Yip Decl. ¶ 79, March 23, 2012.  After a comprehensive review of the

books and records of the hedge funds that the funds were insolvent as early as 2000 and through and

including January 2009.[17]  Revisions to Yip Decl. ¶10 Table, July 19, 2012 (reflecting year end

insolvency for years 2000-2002).  *See also* Revisions to Yip Decl. Ex. 61 (Revised), July 19, 2012

(providing quarterly information reflecting insolvency during period of 2003-2008).

Dancing $ is one of the investors who experienced a net gain or "false profits."  According

to Yip, Dancing $ deposited a total of $675,000 in Nadel's scheme.  More particularly, Dancing $

invested in Scoop Real Estate in October 2006 ($250,000), in July 2007 ($25,000), and in August

2007 ($100,000).  And it invested in Valhalla in November 2006 ($250,000) and January 2007

($50,000).  According to the Receiver, Dancing $ received distributions totaling $782,172.11: one

from Scoop Real Estate (January 2008 for $434,359.29) and two from Valhalla ($346,243.60 in

January 2008 and $1,569.22 in April 2008).  Hence, these "false profits" amount to $107,172.11 (the

amount received from the scheme in excess of the amounts invested).  *See* Yip Decl.¶ 3, Sept. 27,

---

[17]  Yip defined solvency as "an entity that has sufficient current assets to meet or exceed current liabilities."  She defined insolvency to the extent that "liabilities exceed the assets of the entity and its ability to meet these obligations."  The books and records reviewed included bank statements, check copies, cancelled checks, wire transfer documentation, deposit slip, deposit confirmations, tax returns filed by the Hedge Funds, QuickBooks records and information maintained on the Advent system.  Yip additionally reviewed correspondence in which Nadel admitted to:  using all of our liquid assets to cover redemptions and withdrawals, nothing is left." in a letter to his wife, Peg.  The assets were calculated based on detailed analysis of actual balances in each bank and brokerage accounts as well as other assets recorded by the Hedge Funds in its QuickBooks records.  The liabilities were calculated as the obligations to the investors for the principal they had invested and liabilities recorded by the Hedge Funds in its QuickBooks records.  Yip Decl. ¶¶ 80-81, 83-86, March 23, 2012.

2012.  There is no dispute as to whether Dancing $ received these distributions.  *See* Responses to

Requests for Admissions, doc. 99-5 (Morello Decl. Ex.D).

Yip's concluding opinions are:

1.  In order for Nadel to sustain his investment operations, he required a continuous infusion of contributions from his investors.  The infusion of new funds into his operation from new and existing investors allowed Nadel to meet the initial investors' request for redemptions.  With the exception of the *de minimus* rental income that was generated, there is no indication of any other sources of income that Nadel could have used to pay the existing investors.

2.  Nadel created the classic Ponzi scheme by paying existing investors with deposits from new and existing investors.  In my opinion, based on the extensive information that I have reviewed, it is evident that the combination of the actual losses coupled with the ever growing management fees (based on inflated balances from purported gains) caused the ultimate collapse of this Ponzi scheme because there was no way for Nadel to meet the investors' redemption requests without the use of mew funds from existing investors and funds from new investors.

3.  Based on my analysis of the information that we reviewed, it is clear that Nadel operated a Ponzi scheme through Hedge Funds and Fund Managers from at least May 1999 through January 2009, when the funds collapsed.

4.  The Hedge Funds were insolvent as early as 2000 through and including January 2009, when the funds collapsed.

5.  Traders' raised funds from investors beginning as early as May 1999, paid out Management Fees on purported profits yet did not have trading activity until July 2003.

6.  Similar to the Hedge Funds, Traders also operated as a Ponzi scheme misrepresenting purported profits to investors and using the monies of new investments from existing investors or monies from new investors to meet the redemption of existing investors, in furtherance of Nadel's Ponzi scheme.

Yip Decl. ¶¶87-92, March 23, 2012.   In her revisions to her declaration, Yip further stated that:

Pursuant to a review of bank statements, cancelled checks, wire information, deposit slips, copies of checks, QuickBooks files, federal tax returns, Advent software information, and investor files maintained by the Hedge Funds, the investors of the Hedge Funds and Traders incurred losses in excess of $168 million.

Revision to Yip Decl. ¶12, Ex. B (schedule of gains and losses for each investor account), July 19, 2012.

### 3.  *Nadel's criminal proceedings and admission*s

Nadel's admissions, his plea agreement, his testimony at his plea and sentencing hearings, and his criminal judgment are persuasive evidence supporting the Receiver's motion for partial summary judgment for the reasons I stated in my Order of February 3 and reiterated in Part B.1.b of this report.  Nadel's guilty plea is appropriate for summary judgment consideration either under Fed. R. Evid 807 or as a declaration or deposition for purposes of Rule 56(c) and carries a heightened standard of reliability and trustworthiness.  *See In re Slatkin*, 525 F.3d 805, 812 (9th Cir. 2008) (applying Rule 807's residual hearsay exception due to proceeding's reliability); *Scholes v. Lehmann*, 56 F.3d 750, 762 (7th Cir. 1995) (a defendant's admissions in a guilty plea proceeding and in a plea agreement that is part of the guilty plea carry "veracity safeguards" exceeding a deposition).  *See generally In re Rothstein,* 2010 WL 5173796 (S.D. Fla. Dec. 14, 2010) ("[c]riminal plea agreements are admissible to establish the existence of a Ponzi scheme and a wrongdoer's fraudulent intent" and "criminal convictions based on operating a Ponzi scheme establish fraudulent intent for the purposes of the fraudulent transfer provisions");  *LaBella v. Bains,* 2012 WL 1976972 (S.D. Cal. May 31, 2012) (granting summary judgment for receiver against multiple defendants where court took judicial notice of ponzi schemer's guilty plea agreement and found that he operated a ponzi scheme with actual intent to defraud creditors under UFTA); *In re Madoff,* 445 B.R. 206 (S.D. N.Y 2011) quoting *In re Slatkin, supra,* 525 F3d at 814 ("A debtor's admission, through guilty pleas and a plea agreement admissible under the Federal Rules of Evidence, that he operated a Ponzi scheme with the actual intent to defraud his creditors conclusively establishes the debtor's fraudulent intent ... as

a matter of law");  *Armstrong v. Collins,* 2010 WL 1131158 (S.D. N.Y March 24, 2010 (finding

schemer who defrauded investors ran a ponzi scheme and that the entities involved were never

solvent based on schemer's testimony, his guilty plea and expert opinion).  *See also In re McCarn's*

*Allstate Finance, Inc.,* 326 B.R. 843, 851 (M.D. Fla. 2005) ("Even if the information or indictment

did not specifically label the fraud a 'Ponzi scheme,' if the allegations in the information establish

that the debtor ran a scheme whereby the debtor intended to defraud the debtor's creditors, evidence

of a guilty verdict or plea agreement admitting the charges can establish the existence of a Ponzi

scheme.").

When Nadel entered pleas of guilty to all the indictment's counts, he acknowledged, under

oath, his understanding of the accusations and that a factual basis supported his pleas.  *See* doc. 73-

15, p. 10.  Likewise, in his plea agreement, Nadel acknowledged that he was pleadeding guilty

because he was in fact guilty (doc. 73-15).  As the Receiver points out, during Nadel's allocution,

Nadel explained:

> Beginning in about 2002 and continuing to January 2009, I engaged in knowingly and
> willfully fraudulent activity for the purpose of obtaining money from investors in the
> funds and converting the investors; money to my own use.  To do so, I fabricated
> inflated rates of return from my trading activities and fabricated the net asset value
> of each of the funds.  Using these fabricated numbers, I repeatedly communicated to
> investors and prospective investors that the funds had consistent and extremely
> positive performances and rates of return and that the net asset value of each of the
> funds was in the tens of millions of dollars. These communications were knowingly
> and willfully made false and made for the purpose of inducing investors to invest and
> keep their money in the funds.[18]

---

[18]  Although Nadel's sworn statements are obvious evidence that he operated the hedge
funds as a ponzi scheme by the time of the applicable distributions here, Nadel's temporal
recollection is self-serving and contradicted by the record in the criminal case.  For example, the
sentencing-guideline loss calculation dated back to 1999, a fact that Nadel did not object to at his
sentencing proceeding.  And at other times discussed *infra,* Nadel acknowledged he "doctor[ed]"
continuing losses for more than 10 years and that the hedge fund losses could be calculated by

*See* Guilty Plea Transcript, doc. 73-15, p.30. Nadel further stated that he directed his broker to make certain wire transfers among accounts that he controlled "for the purpose of facilitating and concealing the scheme to defraud . . . ." *Id.* at p.31.

At the sentencing hearing, Nadel spoke of his "victims" and clearly acknowledged his guilt:

> I have had almost two years to think about the victims in my case. I have pictured myself in their position while visualizing the faces and hearing the voices of those I knew personally. Recently I read their letters over and over again, until their anger and outrage became mine at myself. I experienced a steep dissent into regret and remorse followed by sorrow and self-hatred, into a deep depression. It took great effort to struggle out of it.
>
> I spend most of my time in examination of my life not to excuse but to try to understand my harmful past behavior. I blame no one but myself for my acts and observe that I have been my own worst enemy. In effect, I have thrown away everything I have lived for: Family, friends, social acceptance, and honor, a sense of self-worth and accomplishment, all my possessions and, finally, freedom itself.

*See* Sentencing Transcript, doc. 86-18, pp.15:23-16:12. Nadel did not object to the restitution amount, nor did he object to those victims identified in his presentence report and included in his judgment. Similarly, when the court advised Nadel of the forfeiture calculation, $162 million, his counsel represented that he had no objection. *See* Preliminary Order of Forfeiture (doc. 73-19), and Sentencing Hearing Transcript (doc. 73-18). The court sentenced Nadel to 168 months of imprisonment. *See* Judgment, doc. 86-17. Nadel's plea agreement, his sworn admissions, his guilty plea, his failure to object to the court's restitution and forfeiture calculations (both premised on his scheme spanning from 1999 to 2009), and court's judgment support Yip's findings.[19]

---

going back to 1998.

[19] As I noted in my Order of February 3, Nadel's failure to object to probation officer's loss calculation in the presentence report admits its factual accuracy. *See United States v. Wise,* 891 F.2d 970, 972 (11th Cir. 1989). This restitution amount (almost $175 million) corresponded

Nadel's own statements further support the Receiver's motion.  In a January 2009 letter found in a hedge fund office shredder by a Scoop Management employee ("Shredded Letter"), Nadel admitted that "[f]or more than ten [years], I have truly believed that [I could] trade my way out of this mess, and [only] in 2008 did it finally penetrate my addled [brain] that this is not to be.  I have managed to ruin hundreds of lives, and I deserve whatever [I] ultimately receive."  Nadel also sent a letter to his family after he disappeared in January 2009 admitting that he had been attempting to "'doctor' continuing losses for almost 10 years."  In the letter, Nadel suggested that the hedge funds losses could be calculated by "go[ing] back as far as possible, to 1998 if we can, to Spear, Leads & Kellogg from Goldman, Sachs, and determine the actual trading losses."  He stated that his "recollection of the more recent losses, say from 2001 on, is about an average of $20 million per year. ..."  Nadel wrote a confidential memo that provided a background of himself and the hedge funds, including the operation of the investment clubs before the formation of the hedge funds.  In the confidential memo, Nadel wrote:

> All six [hedge funds] were traded together as a group usually ... [B]y 1999 the volatile tech bubble created losses.  When the bubble burst I began to "doctor" the trading results.  It started in a small way, but as the assets increased, it became more difficult to cover the losses, and then came 9/11/2001, followed by the recession of 2002.  All of this time, I believed that I could trade my way out of the discrepancies between the stated assets and the actual assets.

*See* doc. 31-3, 31-4, 31-5.[20]

---

with losses to victims from 1999 to 2009.

[20] Given Nadel's recent death, all these statements are admissible per Fed.R.Evid. 804(b)(3)(A) or 807.

####       4.  *Dancing $'s rebuttal*[21]

---

[21]   Dancing $ continues to argue that the Receiver lacks standing to assert a FUFTA claim despite the Court's finding that the Receiver has standing to file this "clawback" case against Dancing $, as Nadel caused the receivership entities, here Valhalla Investment and Scoop Real Estate, to transfer of receivership assets to Dancing $.  *See* doc. 62, Order adopting Report and Recommendation.  Because I find that Nadel controlled Valhalla Investment and Scoop Real Estate, I further find that both entities are "alter egos" of Nadel and that the Receiver, who now stands in the shoes of the hedge funds, has standing to assert a FUFTA claim against Dancing $ based upon the distributions it received from Valhalla Investment and Scoop Real Estate.  *See e.g. Quilling v. Cristell*, No. Civ.A. 304CV252, 2006 WL 316981, *6 (W.D. N.C. 2006) (finding "once Receiver was appointed, the [Ponzi scheme entities] were freed from control of [the Ponzi scheme operator] and the [entities] became entitled to the return of the funds that were wrongfully diverted to the Defendants ... Receiver, as receiver for all entities owned or controlled by [Ponzi scheme operator] including the [Ponzi scheme entities] properly has standing to bring fraudulent transfer claims that he is asserting against Defendants.").  Dancing $ also argues that the Receiver has failed to establish that the distributions to Dancing $ were from Nadel that would have been available to satisfy Nadel's debt to the Receiver.  FUFTA allows a creditor to avoid a debtor's fraudulent "transfer" of property.  *See* docs. 56, 62.  FUFTA defines a "transfer" as "every mode direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance."  Fla. Stat. § 726.102(12).  An "asset" is defined as "property of the debtor" Fla. Stat. § 726.102(2).  The evidence  establishes that the funds transferred to investors, including Dancing $, as part of Nadel's scheme constitutes "property of" Nadel under FUFTA because they are available to pay the debt owed by Nadel to each of the hedge funds arising from Nadel's operation of a ponzi scheme.   Upon consideration of the evidence before me, the evidence overwhelmingly points to findings that Nadel managed the hedge funds, including Valhalla, grossly misrepresented its performance to its investors, and defrauded investors through his control of the hedge funds.  More particularly, the Confidential Private Placement Memorandum for Valhalla Investment, a key document circulated to potential investors in connection with the offer and sale of interests in Valhalla  Investment, indicates that "Valhalla Investment was formed in 1999, purportedly to invest in and/or trade securities, including exchange traded funds ("EFTs").  The General Partner of Valhalla Investment was Valhalla Management, and Valhalla Investment and Valhalla Management retained Nadel and the entity he created and controlled, Scoop Management, as their "investment advisor" to provide "office management and technical services" to Valhalla Management.  Nadel created Scoop Management in 2001, controlled all of its operations, and performed all of its trading activities for the hedge funds.  Scoop Management was responsible for all trading decisions for each of the hedge funds and in essence controlled all of the fund managers, allowing Nadel to perpetrate the ponzi scheme.  Scoop Real Estate, formed in late 2003 and "opened" to investors in 2004, was formed purportedly to invest in real estate and/or trade securities, including ETFs.  The General Partner of Scoop Real Estate was Scoop Capital, and according to the Private Placement Memorandum of Scoop Real Estate,  Nadel was responsible for the day to day investment

In response to this overwhelming evidence, Dancing $ offers little rebuttal evidence in admissible form.  *See Celotex Corp.,* 477 U.S. at 324 (1986) (if the moving party makes the required showing, the burden shifts to the non-moving party to rebut that showing by producing counter-evidence in admissible form).  In an effort to show that Nadel did not control Valhalla Investment and Scoop Real Estate, Dancing $ filed the Receiver's responses to interrogatories (doc. 95-3) and an unauthenticated typewritten "statement" of Nadel dated January 24, 2011, obtained from CNBC's television show "American Greed."  Dancing $ points to the Receiver's interrogatory response and the unsworn television statement as evidence that Valhalla Investment was operated, owned, and run by Neil and Chris Moody, not Nadel. "At best," Dancing $ posits, "the Receiver presents evidence that Nadel handled all of the trading activity for Valhalla as a third party advisor. There is no evidence from which to conclude as a matter of law that Nadel controlled Valhalla, required Valhalla [Investment] to make distributions, or had any role in managing the company."  Per Dancing $, Nadel's corporation had a contract with Valhalla Investment to provide investment advisory services to Valhalla Investment, Valhalla Investment is not the alter ego of Nadel, and the Receiver lacks standing to assert a FUFTA claim against Dancing $ based on a distribution from Valhalla Investment.  Dancing $ says the CNBC statement shows that "Valhalla fund, the first fund formed in 1999, was invested and traded by Neil Moody from inception to the end, not, as alleged by the Receiver, by Nadel."  *See* Stillman Decl. ¶ 3.

None of this alters the overwhelming quantum of evidence the Receiver presents.  First,

---

decisions of the Partnership.  Because the Moodys allowed Nadel to fully control funds, Nadel not only controlled Victory Fund, Victory IRA Fund, and Scoop Real Estate, but also controlled Valhalla Investment, Viking Fund, and Viking IRA Fund.  *See* Yip Decl. ¶¶17, 23-25, March 23, 2012; Wiand Decl ¶¶12, 17-20.

Nadel's back-pedaling, self-serving statements (presumably made in the interview) are inadmissible hearsay and inappropriate for summary judgment consideration.  *Macuba v. Deboer,* 193 F.3d 1316, 1323 (11th Cir. 1999) (the general rule is that inadmissible evidence cannot be considered for summary judgment purposes).  Next, Nadel's remarks do not carry the trustworthiness attached to his guilty pleas, his sworn statements made during his plea and his sentencing, and the resulting criminal judgment grounded on his pleas and a supporting independent factual basis.  Fed. R. Crim. P. 11(b)(3); *Scholes,* 56 F.3d at 762 (ponzi schemer's backpedaling statements made in affidavit were appropriately rejected for summary purposes as schemer should not be able to retract admissions made in plea agreement and guilty plea which bind a party and have greater veracity safeguards).  Moreover, I conclude that the record evidence shows Nadel controlled Valhalla Investment and Scoop Real Estate.  *See* n.21, *supra*.

Dancing $'s only other filing in opposition to the Receiver's partial summary judgment motion is a "Notice of Joinder in Opposition to Motion for Partial Summary Judgment by Defendants in Related Cases 10-cv-166, 10-cv-205, and 10-cv-210" (doc. 96).  The defendants in those cases retained an expert witness, Harold McFarland.  *See Wiand v. Meeker,* 8:10-cv-166-T-17MAP, doc. 89-8, exhibit H; *Wiand v. Morgan,* 8:10-cv-205-T-17MAP, doc. 89-8, exhibit H; *Wiand v. Lee,* 8:10-cv-210-T-17MAP, doc. 125-8, exhibit H.  The expert report McFarland completed for Meeker, Morgan, and Lee indicates that in his opinion there is "significant doubt as to whether these hedge funds were in fact a Ponzi-scheme from the beginning or simply a legitimate business enterprise that at some point became a Ponzi-scheme.  While the Commission found it to be a Ponzi-scheme from 2008, there is insufficient information to determine when exactly, or if, it became a Ponzi-scheme before that."  *See* McFarland Rpt. ¶A(10) (*Wiand v. Meeker,* case no. 8:10-

cv-166, doc. 89-9) . Other defendants against whom the Receiver has filed claims have also retained

McFarland as expert.  Interestingly, McFarland's declaration from *Wiand v. Rowe,* case no. 8:10-cv-

245-T-17MAP, states "there is sufficient evidence to determine that these entities compromised an

elaborate Ponzi scheme some time during or after 2006 … [and] there are some artifacts of a Ponzi

scheme as early as 2003."  *See* McFarland Decl. ¶¶ C(1-2) (*Wiand v. Rowe,* case no. 8:10-cv-245,

doc. 70).  McFarland also testified in the *Rowe* affidavit that "At best, the only thing that can be said

with complete confidence is that the evidence is conclusive that Nadel-Moody was insolvent and a

Ponzi scheme from 2006 forward and inconclusive prior to 2005, further it is unlikely that Nadel-

Moody was a Ponzi scheme prior to 2002."  McFarland Decl.  ¶C(4) (*Wiand v. Rowe*, case no. 8:10-

cv-245, doc. 70.  *See also* McFarland Dep. 62:22-63:12 (*Wiand v. Rowe,* doc. 83-1) ("... the early

years, '99 and 2000, 2001, were definitely not a Ponzi scheme.  So I don't know when it was.  I

believe it was from 2006 forward.  At this point it's my opinion that it was not in '99, 2000, 2001.

It was some time after that.  And the strongest evidence is pretty heavy at 2005, or so, it changed

[into a Ponzi scheme]. … By the end of 2006, I have no questions that it was a Ponzi scheme.")

Regardless of McFarland's inconsistent opinions, even he essentially concedes that Nadel,

at the time of Dancing $'s distributions, operated the hedge funds as a ponzi scheme.  In sum,

Dancing $ has failed to create a triable issue of fact on this issue.  *See American Key Corp. v. Cole

Nat'l Corp.*, 762 F.2d 1569 (11th Cir. 1985) (finding trial court properly awarded summary judgment

for defendant and did not err in assigning "little weight" to plaintiff's expert's affidavits because the

affidavits did not create a material issue of disputed fact).[22]

---

[22]   There are other reasons to assign little weight to McFarland's opinions or even to
strike them for that matter under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579
(1993) (although it is unnecessary to do so).  McFarland admits that he conducted only a partial,

5.  *affirmative defenses, false profits, and prejudgment interest*

a.  *affirmative defenses*

Dancing $ raises set-off as affirmative defense to the Receiver's FUFTA claim.[23]   The gist

of the argument is as follows.  Each of Dancing $'s 136 members invested various amounts into the

LLC and received proportionate shares according to those investments.  Dancing $, in turn, invested

in Scoop Real Estate and Valhalla Investment.  After receiving distributions from the hedge funds,

Dancing $ passed those monies to its members proportionately.  In December 2007, Elendow

(presumably another LLC) was created.  That new entity's ranks included many Dancing $ members

(as many as 53) and new investors.  Those Elendow members who came from Dancing $ used their

hedge fund distributions to invest in Elendow.  And (this where the set-off comes in), Elendow

invested its members monies back into Scoop and Valhalla and lost the entirety of their investments

---

incomplete analysis, had not reviewed certain relevant documents, and did not consider whether Nadel had made any misrepresentations to the hedge fund investors.  *See* McFarland Dep. 72:19-73:17, 127:24-128:6 (*Wiand v. Meeker,* 8:10-cv-166, docs. 92-2 and 92-3) (McFarland testified that he "really had not done the analysis" to determine when first year he saw traits that there was a Ponzi scheme because he had only analyzed the first three years of Traders and had not examined "the other ones").  And, McFarland's criticism that Yip looked at the whole period, 1999 through 2009, as one single unit, is misplaced, as Yip performed a detailed quarterly analysis for each year from 1999 through 2008, and attached no fewer than 62 exhibits demonstrating her thorough analysis of financial statements.  *See*  Yip Decl. ¶¶ 59-60, 82, Ex. 6-61, March 23, 2012; Yip Decl. ¶¶ 25-31, Oct. 11, 2012 (*Wiand v. Meeker,* 8:10-cv-166, docs. 61, 101).

[23]  Dancing $ answered that, per Fla. Stat. § 726.109, it was a good faith transferee without knowledge of any indicia of fraud who provided reasonably equivalent value for any amounts received.  *See* doc. 63, first affirmative defense.  Dancing $ did not raise that defense specifically in its responses to the summary judgment motions.  Regardless, investors in a fraudulent scheme do not, as a matter of law, provide reasonably equivalent value for amounts received from the scheme that exceed original principal investments.  *See Perkins v. Haines,* 661 F.3d 623, 627 (11th Cir. 2011) ("Any transfers over and above the amount of principal– i.e. for fictitious profits– are not made for 'value' because they exceed the scope of the investor's fraud claim and may be subject to recovery.").

(over $600,000).  *See* doc. 115 (Waldman Decl. ¶¶ 1-6).  Dancing $ contends a set-off is appropriate given the losses many of its members suffered.

Set-off is an equitable concept, *see Durham Tropical Land Corp. v. Sun Garden Sales Co.*, 151 So. 327, 328 (Fla. 1932); yet, and despite the injustice suffered by those Dancing $ members who lost money in Elendow, it is difficult to fathom how the defense would apply here. Florida recognizes that to avail oneself of set-off in equity, the defendant must show an existing debt or demand against the complainant in favor of the defendant, and that the debt arose and existed under circumstances where disallowing it would be inequitable.  *Id.*  But, "[t]he very essence and basis for set-off is mutuality of claims; that is to say claims existing between the same parties and in the same right."  *Everglade Cypress Co. v. Tunnicliffe*, 148 So. 192, 193 (Fla. 1933); *see also, e.g. Moran v. Goldfarb*, 2012 WL 2930210 (S.D.N.Y. July 16, 2012) (rejecting set off or offset in clawback case). Elendow's debt claim  is not Dancing $'s claim, notwithstanding their overlapping memberships. And the reason is the legal structure these investors chose to join: an LLC is a business entity created to provide "tax benefits akin to a partnership and limited liability akin to the corporate form." *Olmstead v. F.T.C.*, 44 So.3d 76, 78 (Fla. 2010) quoting *Elf Atochem North Am., Inc. v. Jaffari*, 727 A.2d 286, 287 (Del. 1999); *see also In re Slatkin, supra,* 243 F.Appx at 259.  In sum, I find equitable set-off, no matter the Court's sympathies, does not apply.

### b.  false profits

By his motion (doc. 97), and supported by Yip's declaration (*See* Yip Decl. ¶ 3, Sept. 27, 2012), the Receiver seeks summary judgment on count I for $107,172.11 plus prejudgment interest. Notably, Dancing $ does not dispute the Receiver's calculations as to the amount of the transfers, although it contests any award of prejudgment interests.  Having determined that those these

transfers avoidable under FUFTA, the Receiver is likewise entitle to summary judgment on the uncontested amount.

### c.  prejudgment interest

This Court exercises supplemental jurisdiction over the Receiver's FUFTA claims (doc. 1, ¶8).  *See* 28 U.S.C. § 1367.  As such, state law applies to any issue not governed by the Constitution or treaties of the United States or Acts of Congress.  28 U.S.C. § 1652; *Erie R. v. Tompkins*, 304 U.S. 64, 78 (1938); *Flava Works, Inc. v. City of Miami, FL*, 609 F.3d 1233, 1237 (11th Cir. 2010); *see also* Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction 2d § 4520.  Florida courts have long held the view that prejudgment interest is simply another element of pecuniary damages for making the plaintiff whole from the date of the wrongful loss.  *Bosem v. Musa Holdings, Inc.*, 46 So.2d 42, 45 (Fla. 2010) (reaffirming Florida's position since the turn of the last century).  An award, however, is grounded in equity and not absolute.  *Blasland, Bouck & Lee, Inc. v. City of North Miami*, 283 F.3d 1286, 1297-98 (11th Cir. 2002) (applying Florida law).  Florida courts apply various considerations when evaluating the equities: the extent the plaintiff's conduct contributed to the delay between the injury and judgment; whether the prevailing party failed to mitigate damages; in matters involving public bodies, and in choosing between innocent victims, it is inequitable to put the burden of paying interest on the public.  *Id.*  The list is obviously illustrative as each case is different.  But the driving focus demands balancing the equities at hand.  As the Florida supreme court has said: "interest is not recovered according to a rigid theory of compensation for money withheld, but is given in response to considerations of fairness.  It is denied when its exaction would be inequitable."  *Flack v. Graham*, 461 So.2d 82, 84 (Fla. 1984) quoting *Board of Commissioners of Jackson County v. United States,* 308 U.S. 343, 352 (1939).

In view of these principles, I conclude that to exact prejudgment interest from Dancing $ would be inequitable.  Despite its position as a "net winner," compared to the greater number of "net losers" Nadel swindled, Dancing $ is certainly not a winning investor in the normal sense.  Like the net losers, Dancing $ invested in the hedge funds assuming their legitimacy.  That it received a return in excess of its investments was likely serendipitous.  With the avoidance of those positive transfers (the amounts above principal invested), requiring Dancing $ to pay more out of its pocket in the form of prejudgment interest would not satisfy the goals for making the award.  It would not make the "hedge funds" any more whole, as Dancing $ presumably could stand in line with the other net losers seeking compensation from the Receiver.  Simply put, Dancing $ members (despite the LLC's legal fiction), have suffered enough.

### D.  Conclusion

As one court recently noted

> Ponzi schemes leave no true winners once the scheme collapses.  In recognition of that unpleasant reality, courts adhere to the 'principle that equality is equity' in dealing with the aftermath of an imploded Ponzi scheme.

*Janvey v. Democratic Senatorial Campaign Comm., Inc. et al.,* 793 F.Supp. 2d 825, 858 (N.D. Texas 2011) citing *Donell, supra,* 533 F.3d at 779.  Upon consideration of the evidence before me, I find that Nadel operated the hedge funds as a ponzi scheme at the time of the transfers to Dancing $, and that the uncontroverted transfers to Dancing $ were made with the actual intent to hinder, delay, or defraud as required by Fla. Stat. § 726.105(1)(a).  For the reasons given, it is hereby

RECOMMENDED:

1.  That the Receiver's motion for summary judgment (doc. 97) be GRANTED and that the Clerk be directed to enter judgment for the Receiver and against Dancing $ in the amount of

$107,172.11.

2.  That the Receiver's renewed motion for partial summary judgment (doc. 72 ) be found moot.

3.  That the Receiver's motion to strike report of Defendants' designated expert, Harold McFarland, and to Preclude His Testimony at Trial (doc. 102) be DENIED.

4.  That all pending motions be denied and the Clerk directed to close the case.

IT IS SO REPORTED at Tampa, Florida on November 29, 2012.


_Mark A. Pizzo_
MARK A. PIZZO
UNITED STATES MAGISTRATE JUDGE


### **NOTICE TO PARTIES**

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its service shall bar an aggrieved party from attacking the factual findings on appeal.  28 U.S.C. § 636(b)(1).

cc:    Hon. Elizabeth A. Kovachevich
       Counsel of Record